JACKSON LEWIS LLP
    59 Maiden Lane
    New York, New York 10038-4502
    (212) 545-4000
    Attorneys of Record:
    Kevin G. Lauri (KL 8714)
    Dana J. Scher (DS 7591)

ATTORNEYS FOR DEFENDANTS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WESLEY ARTOPE,<br><br>                Plaintiff,<br><br>vs.<br><br>CENTER FOR ANIMAL CARE AND CONTROL, INC., NEW YORK CITY ANIMAL CARE AND CONTROL and ED BOKS,<br><br>                Defendants. | Case No.: 05 CV 9283 (KMW)(RLE)<br><br><br>**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS** |

       Defendants Animal Care and Control of New York City ("ACC") and Ed Boks ("Boks"), by and through their attorneys, Jackson Lewis LLP, submit this statement of undisputed material facts pursuant to Local Civil Rule 56.1 of the United States District Court, Southern District of New York and by Order of the Honorable Kimba M. Wood, United States District Court Judge, in support of Defendants' request to move for summary judgment as to all claims in Plaintiff's Complaint[1] in the above-captioned matter and to submit a memorandum of law in support of such motion.

---

[1] A copy of Plaintiff's Complaint is attached to the accompanying Affidavit of Kevin G. Lauri, Esq. ("Lauri Aff."). as Exhibit "1."

## STATEMENT OF FACTS NOT IN DISPUTE[2]

**A.**    **The Parties**

**Animal Care & Control of New York City ("ACC)**

1.    ACC is a not-for-profit corporation that provides animal care and control services in the City of New York.  (Pl. Dep., pp. 62-63; City of New York Office of the Comptroller "Audit Report on the Shelter Conditions and Adoption Efforts of the Center for Animal Care and Control," dated June 6, 2002, referred to herein as "NYC Audit Report," p. ES-1[3]).

2.    ACC operates under a contract with the New York City Department of Health.  (NYC Audit Report, p. ES-1).

3.    ACC seizes, rescues and accepts stray, lost, homeless, unwanted or abandoned animals (primarily dogs and cats).  (Pl. Dep., pp. 62-63; NYC Audit Report, pp. ES 1-2).

4.    ACC then provides the animals with medical treatment and shelter, and attempts to find placements for the dogs, such as adoptions.  Where necessary, ACC euthanizes the animals.  (Id.)

5.    ACC maintains three full service shelters, two receiving centers and one administrative office in New York City.  (NYC Audit Report, pp. ES-1-2).

6.    The full service centers are located in Manhattan, Brooklyn and Staten Island.  At these shelters, ACC provides medical treatment, shelter and adoption services.  (NYC Audit Report, pp. ES-1-2).

---

[2] The facts set forth herein are based in part on the deposition testimony of Plaintiff, Ed Boks, Gerald Allen and Richard Gentles.  Pertinent portions of the deposition testimony of Plaintiff, Mr, Boks, Mr. Gentles and Mr. Allen are attached as exhibits to the Lauri Aff. as Exhibits "2," "3," "4" and "5," respectively.  The deposition testimony is cited to herein as "Pl. Dep., p. __," "Boks Dep., p. __," "Allen Dep., p. __" and "Gentles Dep., p. ___."
[3] A copy of the NYC Audit Report is attached to the Lauri Aff. as Exhibit "6."

7. The receiving centers are in Queens and the Bronx. At the receiving centers, ACC accepts homeless and abandoned animals and where appropriate transfers them to the full service centers or other shelters. (NYC Audit Report, pp. ES-1-2).

8. ACC's administrative office is in downtown Manhattan. ACC's executive management team works in the downtown office. (NYC Audit Report, p. ES-3; Pl. Dep., p. 67; New York City's Center for Animal Care & Control Inception Report, Prepared by Ed Boks (referred to herein as the Inception Report) p. 5).

**Ed Boks**

9. Ed Boks served as the Executive Director for ACC between July 2003 and January 2006. (Boks Aff.,[4] ¶ 1).

10. The Board of Directors for ACC hired Boks to reorganize ACC after the New York City Office of Comptroller identified significant problems with ACC's shelters. (Pl. Dep., pp. 189-190, 193; NYC Audit Report; Inception Report,[5] p. 3).

11. The problems included mismanagement of animals, inhumane shelter conditions and poor medical treatment. (Id.)

12. Boks replaced Marilyn Haggerty Blohm, who had been ACC's Executive Director between 1997 and 2002. (Pl. Dep., p. 68; Boks Dep., p. 24).

**Plaintiff**

13. Plaintiff is an African-American male. (Complaint, ¶ 23).

14. Plaintiff was hired by ACC in 1997. (Pl. Dep., p. 54).

15. Plaintiff continued to work for ACC in various capacities until January 15, 2004. (Complaint, ¶¶ 11-15).

---

[4] A copy of the Affidavit of Ed Boks, dated February 8, 2007, is attached to the Lauri Aff. as Exhibit "12."
[5] A copy of the Inception Report is attached to the Lauri Aff. as Exhibit "7."

16.     The job positions Plaintiff held during his employment with ACC were: Senior Animal Care Specialist, Manhattan Shelter (1997-1998): Assistant Director, Manhattan Shelter (1998-1999); Training Coordinator, ACC (1999); Director of Training, ACC (2000-2001); Deputy Director of Operations, ACC (2002); Director of Shelter Operations (2003). (Pl. Dep., pp. 46, 208; Complaint, ¶¶ 11-15).

17.     Plaintiff's employment was terminated on or about January 14, 2004 when his job position as Director of Shelter Operations was eliminated pursuant to Boks' reorganization of the ACC. (Boks Dep., pp. 79-80, 92-93; Pl. Dep., pp. 208-209).

18.     Boks also eliminated the job position of James Scott (Caucasian), Director of Facilities, pursuant to the reorganization. (Boks Dep., pp. 92-93)

19.     Richard Gentles (Caucasian), who was previously Deputy Executive Director of ACC, took over Plaintiff's and Scott's job responsibilities and became "Director of Operations." (Pl. Dep., p. 208; Boks Dep., pp. 79-80).

**B.  Plaintiff's Employment History**

20.     Over the years, Marilyn Haggerty-Blohm, ACC's Executive Director, promoted Plaintiff into ACC's management, including its executive team. (Complaint, ¶ 11; Pl. Dep., pp. 69, 88-89, 117, 134).

21.     In these positions, Plaintiff had significant responsibility for how ACC managed animals, maintained shelter conditions, and provided medical treatment to animals. (Pl. Dep., pp. 58-61, 70-72, 77-84, 95, 98-103, 108-110, 112, 120, 125-126, 135).

22.     Specifically, in 1997, Blohm hired Plaintiff to work in the Manhattan shelter as a Senior Animal Care Specialist (also known as Senior Veterinary Technician or Medical Manager) in the Medical Department of ACC's Manhattan shelter. (Pl. Dep., pp. 54-56, 58).

4

23.    Plaintiff had a Bachelors Degree in Psychology, an Associates Degree in Veterinary Technology, licenses and certifications as a technician, animal handler, and animal rehabilitator, and work experience in animal training, handling and treatment. (Pl. Dep., pp. 13-18).

24.    As Senior Animal Care Specialist/Veterinary Technician, Plaintiff was responsible for handling the animals at the Manhattan Shelter and providing them with medical treatment, including administering euthanasia. (Pl. Dep., pp. 58-61).

25.    Plaintiff also supervised and trained other veterinary technicians in the handling of animals and administration of euthanasia. (Id.)

26.    In 1998, Blohm promoted Plaintiff to the position of Assistant Director for the Manhattan Shelter. (Complaint, ¶ 11; Pl. Dep., p. 69).

27.    In that position, Plaintiff assumed more responsibility over what happened to animals once they entered the shelter, including whether animals were adopted, training the staff, assigning employees to specific jobs, and making sure staff performed their jobs within performance expectations. (Pl. Dep., pp. 70-72).

28.    Plaintiff supervised multiple departments in the Manhattan shelter. (Pl. Dep., p. 77).

29.    One of the departments Plaintiff supervised was the Kennels Department, which was responsible for handling animals, making sure the animals were maintained in clean cages and healthy conditions and received adequate exercise, food and water. (Pl. Dep., pp. 77-79, 84).

30.     He trained the employees in the Kennels Department with respect to animal handling, detecting medical issues, preventing disease transmission and cage-cleaning. (Pl. Dep., pp. 80-83).

31.     Plaintiff also supervised the Medical Department, which was responsible for providing medical treatment for the animals.  (Pl. Dep., pp. 77-78).

32.     He trained employees in the Medical Department with respect to disease detection, medical evaluations and administration of euthanasia.  (Pl. Dep., pp. 83-84).

33.     In addition, Plaintiff provided training to employees at the other ACC shelters.  (Pl. Dep., pp. 86-87).

34.     In 1999, Blohm promoted Plaintiff to Training Coordinator for ACC. (Complaint, ¶ 12; Pl. Dep., pp. 88-89).

35.     This expanded Plaintiff's responsibilities beyond the Manhattan shelters to all of ACC's shelters.  (Pl. Dep., pp. 87-88).

36.     As Training Coordinator for the entire ACC system, Plaintiff was responsible for training employees in all departments at ACC, including the Kennels and Medical departments.  (Pl. Dep., pp. 95, 98-99, 108-109, 125-126).

37.     He also was responsible for creating training materials, evaluating the conditions at all the shelters, identifying any problems at the shelters and training employees in how to rectify those problems.  (Pl. Dep., pp. 95, 98-103, 108-110).

38.     From time to time, Plaintiff filled in for any shelter managers who were absent or needed additional help.  (Pl. Dep., pp. 94-95).

39.     Based on his expertise in animal handling and behavioral assessment, he also evaluated problem animals.  (Pl. Dep., p. 111).

40.     In addition, Plaintiff filled in for the Director of Operations, Theresa Geary, whenever she was not available.  (Pl. Dep., pp. 113, 115).

41.     In 1999, Blohm promoted Plaintiff to Director of Training, ACC. (Complaint ¶ 13; Pl. Dep., p. 112).

42.     Plaintiff continued to be responsible for training employees in the Kennels and Veterinary Departments, evaluating shelters and helping to resolve problems at the shelters. (Pl. Dep., pp. 112, 125-126).

43.     He received a higher title and salary with this promotion.  (Pl. Dep., p. 112).

44.     In 2002, Blohm promoted Plaintiff to Deputy Director of Operations for ACC.  (Complaint, ¶ 14; Pl. Dep., p. 117).

45.     As Deputy Director of Operations, Plaintiff continued to be responsible for training employees at the shelter, evaluating shelters, identifying problems and helping to resolve problems in the Kennels and Medical Departments at the shelters.  (Pl. Dep., pp. 120, 126-128).

46.     It was also his responsibility to make sure that all the managers of the individual shelters performed their jobs well.  (Pl. Dep., p. 133).

47.     In addition, he gained some responsibility for ACC's public relations, human resources and volunteer program.  (Pl. Dep., pp. 120, 128-131).

48.     Plaintiff received a salary increase with this promotion.  (Pl. Dep., pp. 117, 132).

49.     He reported directly to Theresa Geary, who was Director of Operations. (Pl. Dep., pp. 117, 132).

50.    In 2003, Blohm promoted Plaintiff to Director of Shelter Operations. (Complaint, ¶ 15; Pl. Dep., pp. 134-135).

51.    As Director of Shelter Operations, Plaintiff had all the same job responsibilities as when he was Deputy Director of Operations.  (Pl. Dep., p. 135).

52.    In addition, he gained additional responsibility within human resources and client relations.  (Pl. Dep., pp. 135-136).

**C.    New York City's 2002 Audit Report Severely Criticized Shelter Conditions & Training at ACC**

53.    Between January 1999 and June 2001, the New York City Office of the Comptroller ("NYC Comptroller's Office") conducted an audit of ACC's shelter operations/conditions and adoption efforts.  (NYC Audit Report, pp. ES-3-4).

54.    At the conclusion of the Audit, the Comptroller's office issued an Audit Report, which it published on June 6, 2002.  (NYC Audit Report).

55.    The NYC Audit Report concluded that during the time period covered by the audit, ACC did not provide humane conditions for all animals in the shelters and that animals often received poor veterinary care.  (NYC Audit Report, p. ES-6)

56.    These were areas for which Plaintiff was responsible, i.e., training Kennels and Medical Department employees how to properly treat, handle and house animals, identifying problems at the shelters and helping employees fix those problems.    (Complaint, ¶¶ 12-13; Supra, ¶¶ 34-44).[6]

---

[6] As set forth above, Plaintiff was the Training Coordinator and Director of Training for ACC between 1999 and 2001.  As such, he had a high degree of responsibility for shelter conditions and veterinary care at ACC.  Among other things, he was responsible for training all employees in how to run the shelters and treat the animals properly, evaluating shelter conditions, assessing problems at the shelters, and showing employees how to correct any problems.  (Complaint, ¶¶ 12-13; Supra, ¶¶ 34-44).

57.     An entire section of the NYC Audit Report was dedicated to explanation of the many problems identified with shelter conditions, entitled "Animals Are Not Always Sheltered Under Humane Conditions." (NYC Audit Report, p. ES-6).

58.     Some of the specific problems identified in the NYC Audit Report were:

(a)     More training was needed with respect to the euthanasia process, as evidenced by many accidental euthanasia of animals (NYC Audit Report, pp. 27-29).

(b)     Poor veterinary care and animal care practices by seven veterinary technicians, including veterinary technicians performing procedures instead of the veterinarian, improper neutering and spaying, infections from procedures, misevaluation of animals, providing incorrect information about animals' sex and age and failing to detect health issues, (NYC Audit Report, pp. 29-33).

(c)     Poor supervision of veterinary staff and reliance on unlicensed veterinary technicians, (NYC Audit Report, p. 33)

(d)     Over 20 employees had been cited for animal abuse, neglect, accidental euthanasia or poor veterinary care, however contrary to ACC's protocols, all those employees were not immediately terminated, (NYC Audit Report, pp. 23-24).

(e)     Dogs were rarely exercised (NYC Audit Report, pp. 15-16).

(f)     Animals were not provided constant access to water (NYC Audit Report, pp. 16-17).

(g)     Cages were not consistently spot-cleaned, as a result of which animals were kept in cages soiled with urine or feces (NYC Audit Report, pp. 17-18).

(h)     Many cages had apparently not been cleaned for quite some time, as evidenced by multiple piles of feces, partially dried feces and stains from dried up puddles of urine and diarrhea, (NYC Audit Report, p. 18).

(i)     Contagious animals were mixed with healthy animals and not kept in separate wards (in addition, the Staten Island shelter had no separate ward at all for contagious animals), in violation of standard protocols for shelter operations, (NYC Audit Report, p. 18).

(j)     Dogs and cages were consistently wet and not dried before animals reentered, which was inconsistent with ACC's cleaning procedures and could increase chances of disease transmission, (NYC Audit Report, p. 19).

(k)     Cats and dogs were kept in the same rooms, animals kept in hallways instead of wards, and no separate wards for nursing mother animals and their young, all of which caused and/or increased stress to animals, (NYC Audit Report, p. 20).

59.     Additionally, the NYC Audit Report criticized ACC's management as being defensive and working only to "push animals through the system" as opposed to providing humane care for the animals.  (NYC Audit Report, p. 64).

**D.**  **ACC Hires New Executive Director, Ed Boks, Who Conducts Further Evaluation of ACC**

**ACC's Leadership Resigns and Ed Boks Gets Recruited to ACC**

60.    Shortly after publication in June 2002 of the NYC Audit Report, which was highly critical of ACC's shelter conditions and other areas, several top management employees resigned from ACC.  (Pl. Dep., p. 134).

61.    Marilyn Haggerty Blohm, the Executive Director of ACC and the person who promoted Plaintiff throughout the years, also left the ACC.

62.    In early 2003, Teresa Geary, Director of Operations and Plaintiff's boss, also resigned.  (Pl. Dep., p. 134).

63.    Julian Praeger, who was the General Counsel for ACC, became the Interim Executive Director.  (Pl. Dep., pp. 136-138).

64.    Throughout Fall 2002 through Spring 2003, ACC's Board of Directors searched for a new, permanent Executive Director.  (Boks Dep., pp. 12, 14, 20.).

65.    The Board of Directors actively recruited Ed Boks for this position.  (Boks Dep., pp. 12-14, 20).

66.    At the time, Boks was working as Executive Director of the animal shelter in Maricopa County, Arizona.  (Boks Dep., p. 36).

67.    Under Boks' administration, the Maricopa County animal shelter had come to be regarded as one of the most innovative animal control departments in the country. (Id.)

68.    In or about July 2003, ACC's Board of Directors hired Boks to work part-time as the Executive Director for ACC.  (Pl. Dep., pp. 146-147).

69.     Boks worked part-time for ACC between July 2003 and December 2003. (Boks Dep., pp. 37-38).

70.     To do this, he spent two weeks of every month in New York as part-time Executive Director of ACC, and the other two weeks of the month in Arizona as part-time Executive Director of the animal shelter in Maricopa County.  (Boks Dep., pp. 23-24, 37, 38, 44).

71.     In January 2004, Boks became full-time Executive Director of ACC. (Boks Dep., p. 39).

### Boks' Evaluated ACC and Found Significant Problems with Shelter Conditions, Training and the Medical Program – Which Were Areas Under Plaintiff's Control

72.     Boks' first act as part-time Executive Director for ACC was to assemble a three-person team of volunteer consultants who would evaluate ACC's shelter operations, procedures, protocols and treatment of animals, assess ACC's customer service and medical functions and identify areas for reorganization.  (Pl. Dep., pp. 193-194; Boks Dep., pp. 50, 65, 94; Gentles Dep., pp. 9-10, 54, 72).

73.     The volunteer consultants were Mary Martin, Richard Gentles and Brenda Sipes.  (Boks Dep., pp. 95-96).

74.     Ms. Martin was working at the time as Director of Medical Services for the Maricopa County animal shelter.  (Boks Dep., pp. 62, 96; Gentles Dep., p. 76).

75.     Mr. Gentles was a former Director of Law Enforcement for the New York City Department of Parks & Recreation, has a B.A. in economics and two masters degrees in management and human organization science, and had extensive experience in operations,

particularly in evaluating operations and making suggestions to improve operations.[7]  (Gentles Dep., pp. 7, 12-13, 20-21, 27, 65-67, 73; Boks Dep., pp. 39-40, 43, 93).

76.    Ms. Sipes was an expert in the field of shelter facilities and management. (Boks Dep., p. 96).

77.    In July 2003, Boks and the three volunteer consultants conducted their evaluation of ACC's shelter conditions, veterinary care, operations and facilities.  (Boks Dep., pp. 95-96).

78.    During this time period, Plaintiff was the Director of Shelter Operations for ACC.  As such, he had a high degree of responsibility for shelter conditions at ACC and its medical program.  (Supra, ¶¶ 36-52).

79.    Among other things, he was responsible for training all employees in how to run the shelters and treat the animals, evaluating shelter conditions, assessing problems and the shelters and showing employees how to correct any problems.  (Supra, ¶¶ 36-52).

80.    The evaluation by Boks, Gentles, Martin and Sipes was comprehensive. (Inception Report, p. 3).

81.    At the end of the evaluation period, Boks and Martin prepared a written report that contained a needs assessment and a discussion of a strategic planning initiative for improving ACC (referred to herein as "Inception Report."  (Inception Report, p. 3).[8]

82.    In his Inception Report, Boks identified problems with respect to training, disease transmission (as a function of shelter conditions), the medical program and operations

---

[7] In his previous job as Director of Law Enforcement for the Parks Department, Gentles was responsible for, inter alia, conducting pet rescues, enforcing city ordinances relating to animals and supervising the Parks Department mounted unit (up to nine horses).  (Boks Dep., p. 43; Gentles Dep., pp. 66-67).

[8] In addition, Sipes compiled a separate report detailing conditions at all of ACC's physical facilities.  A copy of Sipes' Report is attached to the Lauri Aff. as Exhibit "8."

overall – all of which were areas for which Plaintiff was responsible.  (Inception Report, ¶¶ 36-52).

83.     Some of the specific problems he identified were:

**Training**

(a)     "the critical challenges facing [ACC] involve staff weaknesses . . . No supervisory training is provided and supervisors and managers alike are set up to fail.  And they are failing miserably." (Inception Report, p. 5).

(b)     "A training curriculum, and written policies and procedures need to be developed, implemented and enforced."  (Inception Report, p. 6).

(c)     "[C]ACC provides no medical training to any of its staff." (Inception Report, p. 7).

(d)     "the lack of medical training has resulted in field and kennel officers not knowing how to manage medical emergencies, veterinarians doing technical work because they do not trust the skill level of their support staff; poor or no information given to the public; high rates of disease; unrealistic expectations of the medical team." (Inception Report, p. 7).

(e)     "Kennel staff is not trained appropriately in disease transmission." (Inception Report, p. 7).

(f)     "Euthanasia training is inadequate and supervision is lax." (Inception Report, p. 8).

(g)     "Medical staff is required to perform animal behavior evaluations, and yet no one on the medical staff has had any animal behavior training.   This results in inappropriate evaluations and an inordinately high euthanasia rate." (Inception Report, p. 8).

**Disease Transmission**

(h)     "There is no logical plan for treatment of sick and injured animals . . . contagious cases are overlooked for days allowing these sick animals to put all the other animals in the shelter at risk." (Inception Report, p. 6).

(i)      "Animals not fed or their cages cleaned adequately or in a timely fashion.   This stresses the animals further increasing the risk of illness." (Inception Report, p. 6).

(j)      "Kennel attendants handling sick animals followed by well animals without washing their hands or wearing protective clothing.  (Hand sanitizers are not readily available)."  (Inception Report, p. 6).

(k)     "No gowns or protective clothing are available."   (Inception Report, p. 6).

(l)      "Gloves are available but used only to protect hands not stop the spread of disease.  (The gloves are not changed between handling animals.)"  (Inception Report, p. 6).

(m)    "Animals are moved from cage to cage during the cleaning process allowing for further exposure to disease." (Inception Report, p. 6).

(n)     "Feces and urine are washed from cage to cage." (Inception Report, p. 6).

**Medical Program**

(o)     "Especially disconcerting is the systematic way the professional veterinary staff has been excluded from the decisionmaking process." (Inception Report, p. 5).

(p)     "Veterinarian's time and skills are misdirected to managerial and technician tasks instead of surgery, further slowing the life saving process of moving animals out of the shelters." (Inception Report, pp. 6-7).

(q)     "Managers with no understanding of medical processes plan and oversee all the medical programs and facilities without any input from the medical team." (Inception Report, p. 7).

(r)     "Veterinarians and technicians were hired that do not have the appropriate level of expertise resulting in the need to outsource and pay for spay/neuter services for any dog over 40 pounds . . . [or] any dog or cat with any kind of unusual condition." (Inception Report, p. 7).

(s)     "Increase illness due to animals waiting long periods of time for surgery." (Id.)

(t)     High numbers of animals leaving the shelter unsterilized (voucher system)." (Id.)

(u)     "Increased work for shelter staff that must transport animals to other agencies for surgery and follow up to ensure spay/neuter compliance." (Id.)

**Operations**

    (v)    "The current management by degree from Park Place is ineffective and too far removed from operations." (Inception Report, p. 5).

    (w)    "Policies and procedures are unclear and unevenly enforced . . . This results in:  unclear understanding of expectations, staff mistrust of management due to perceived unfair enforcement of policies, low morale and high inefficiency, each shelter and sometimes each employee making up their own rules." (Inception Report, p. 5).

84.    Boks formed the conclusion that as Director of Shelter Operations, Plaintiff was responsible for many of these failings. (Boks Dep., p. 107).

85.    In addition, Boks identified the following, specific problems with Plaintiff's job performance and work conduct:  poor managerial skills, organizational skills, time management skills and performance management skills; inadequate training of veterinarians, inadequate training for euthanasia procedures; shelter staff's inattention; excessive time for completion of adoptions; absence of numbering system in kennels for tracking animals; and use of expensive microchip technology to track animals likely to be euthanized anyway. (Boks Dep., pp. 96-98).

    \*    \*    \*    \*

86.    After the evaluation, in September 2003, Boks hired Gentles to be his Assistant/Deputy Executive Director. (Boks Dep., pp. 54-55; Pl. Dep., p. 195).

87.    Gentles would serve as Boks' "eyes and ears on the ground" while Boks split his time between New York and Arizona. (Boks Dep., pp. 54-55).

88.    Gentles was responsible for helping Boks evaluate the shelters, implement

Boks' directives, assist with operations and keep Boks updated on everything at ACC.  (Pl. Dep.,

p. 199; Boks Dep., pp. 54-55, 75-77).[9]

**E.    Boks Reorganized the ACC's Executive Team, Resulting in Termination of Several Employees, Including Plaintiff**

89.    Boks concluded that ACC needed to be reorganized, explaining that

"Meaningful reorganization will be a primary focus during my tenure." (Inception Report, p. 5).

90.    In his Inception Report, Boks outlined his plans:

> Tremendous organizational efficiencies can be achieved through reorganization.  I am working with staff to streamline the chain of command to more effective ensure an appropriate division of labor. When managers are able to focus on their specific areas of operation, they are better able to manage staff, identify training needs, and enact meaningful policies and procedures.  The current management by decree from Park Place is ineffective and too far removed from operations.

(Inception Report, p. 5).

91.    Boks planned to accomplish the reorganization over a period of several

months.  (Boks Dep., pp. 80, 88; Inception Report, p. 3).

**Restructuring and Eventual Elimination of Plaintiff's Job Position**

92.    During the Summer 2003, Boks met with Plaintiff and told him about the

reorganization.  (Pl. Dep., pp. 159-160).

93.    Boks believed Plaintiff failed in the job as constituted at the time because

the position encompassed too many responsibilities for *Plaintiff* to handle – inter alia,

responsibility for shelters, training all staff *and* the medical program.  (Boks Dep., pp. 102-103,

105).

---

[9] Boks selected Gentles for this position because after working for many hours with Gentles during the summer (when Gentles was a volunteer), Boks determined Gentles had "extraordinary ability to make an advanced skilled

94. Accordingly, in the Fall 2003 Boks restructured Plaintiff's job position by essentially dividing it into two separate positions – Director of Shelter Operations and a new, Medical Director position. (Boks Dep., p. 82).

95. Plaintiff was kept on as Director of Shelter Operations but his responsibilities were reduced so that he was only responsible for the shelter operations, i.e., animal handling, animal behavioral assessment and shelter conditions. (Boks Dep., pp. 103-104).

96. He no longer would have any responsibility for ACC's medical program or for training. (Boks Dep., pp. 98-99, 102-103).

97. Instead, responsibility for the medical program was transferred to the new Medical Director position, and Boks hired Mary Martin, Caucasian, into that position. (Boks Dep., p. 105).

98. Boks hoped that by reducing Plaintiff's job responsibilities and reconstituting the job to match Plaintiff's expertise in animal handling, then Plaintiff would succeed in his job. (Boks Dep., pp. 98-99).

99. Plaintiff's compensation was reduced slightly to bring his pay in line with the other Directors (who previously earned less than Plaintiff) and to reflect that Plaintiff would have fewer responsibilities than before. (Boks Dep., pp. 95, 98-99, 101-102, 105-106.)

100. To help Plaintiff succeed in his newly reconstituted job as Director of Shelter Operations, Boks provided Plaintiff with a "road map" of 36 improvements and/or changes he wanted Plaintiff to make at the shelters. The list is referred to as "Shelter Operations,

---

level that I needed in that department," and that Gentles "is a straight shooter [and] he has the skill set that this department needs." (Boks Dep., pp. 59, 61).

Performance Management Plan." (Performance Management Plan;[10] Boks Dep., pp. 80-81, 94-95; Pl. Dep., pp. 149-153, 165-166).

101.    The changes and improvements set forth on the Performance Management Plan included improving the cleanliness, appearance and smell of the shelters, reconfiguring caging, ensuring all cleaning and feeding was done promptly, and other non-medical protocols for animal handling. (Id.; Pl. Dep., pp. 152-159, 166; Boks Dep., pp. 80-81, 99-100).

102.    Over the next several months, Boks observed Plaintiff. (Boks Dep., pp. 80-81).

103.    He concluded that Plaintiff did not satisfactorily perform his job responsibilities or meet the goals on the Performance Management Plan. (Boks Dep., pp. 80-81, 99-100).

104.    In fact, as time went on, Plaintiff continued to fail in his responsibilities and other employees had to take on more and more of Plaintiff's responsibilities. (Boks Dep., p. 105).

105.    Boks advised Plaintiff orally and in writing that his conduct was not in accordance with the Performance Management Plan:

> Q.    Did you directly evaluate his ability to accomplish any of the 35 points?
>
> A.    We discussed it and we would ask and he would say, Ed, I just don't understand, you know, I am always caught up in going in a million different directions. He was very vague and not specific in why he felt he couldn't accomplish it. Only in saying that he felt he was overwhelmed.

---

[10] A copy of the Performance Management Plan provided to Plaintiff is attached to the Lauri Aff. as Exhibit "9."

(Boks Dep., p. 100).   (See also Email from Boks to Plaintiff, Gentles and Martin, regarding Performance Management Plan, dated November 12, 2004[11]) ("Wes, This doesn't follow the PMP plan I sent out.").

106.    Boks also received negative input about Plaintiff's performance from other members of the executive team.

107.    Specifically, Mike Pastore (Director of Field Operations) and Michael Galeb (Controller) complained to Boks that Plaintiff did not submit budgetary information in a timely fashion.  (Boks Dep., pp. 100-101).

108.    An IT (Information Technology) employee expressed concern about the accuracy of data collected by Plaintiff.  (Boks Dep., pp. 100-101).

109.    Martin told Boks she "had a real concern with respect to the state of the medical program which she found[ed]  [sic] and felt that it was a good thing that, you know, [h]e [Plaintiff] had been relieved of that responsibility."  (Boks Dep., pp. 100-101).

110.    Boks also received feedback from Gentles that Plaintiff was "difficult to find, very difficult to motivate, very difficult to see projects through successfully."  (Boks Dep., p. 101).

111.    By late December 2003, Boks determined that Plaintiff was failing even in the restructured job with less responsibility.  (Boks Dep., pp. 81, 99).

112.    Therefore, Boks decided to eliminate the Director of Shelter Operations position and terminate Plaintiff's employment.  (Boks Dep., pp. 79-80).

113.    He had two reasons for this.   First, having evaluated Plaintiff's job performance for six months, he concluded Plaintiff was not successful in his job.  (Id.)

---

[11] A copy of the electronic mail from Boks to Plaintiff, Martin and Gentles, dated November 12, 2004, is attached to the Lauri Aff. as Exhibit "10."

114.     Second, he believed that it would be more efficient to create one new position that combined Plaintiff's job as Director of Shelter Operations with two other positions he would eliminate:  the Director of Facilities position (held by James Scott, a Caucasian) and the Deputy Executive Director (held by Richard Gentles).  (Boks Dep., p. 105).

115.     The new position would be called "Director of Operations" and Boks planned to hire Gentles for that position.

> Q.     And in January 200[4] you let Mr. Artope go?
>
> A.     After six months of evaluating the organization.
>
> Q.     You fired Mr. Artope for work-related reasons?
>
> A.     Yes, it was a business decision.
>
> Q.     What was a business decision?
>
> A.     There's a better economy of scale by reorganizing.  The department was the primary reason.  The secondary reason is he was failing in the performance of his responsibilities.

(Boks Dep., pp. 79-80).

116.     Boks met with Gentles and Allen to inform them of his decision to eliminate Plaintiff's job position.  (Gentles Dep., p. 123).

117.     Allen believed that Boks' decision to eliminate Plaintiff's job position had nothing to do with Plaintiff's race.  (Allen Aff.,[12] ¶ 2).

118.     Allen never expressed any concern that race was a factor in Boks' decision to terminate Plaintiff's employment.  (Allen Dep., pp. 34-35).

119.     Allen told Boks that because Plaintiff was an African-American employee, there was the potential ACC might face a lawsuit for discrimination if a white person assumed Plaintiff's job responsibilities.  (Allen Dep., p. 35).

---

[12] A copy of the Affidavit of Gerald Allen, dated February 9, 2007, is attached to the Lauri Aff. as Exhibit "13."

120.    On or about January 14, 2004, Boks and Allen met with Plaintiff and informed him that his position would be eliminated, effective immediately.  (Pl. Dep., p. 208; Allen Dep., p. 13).

121.    ACC offered to provide Plaintiff with severance pay in exchange for a release of his claims.   Plaintiff never signed the release.   (Proposed Agreement, Waiver and General Release).[13]

*        *        *        *

122.    Boks never made any racial slurs against Plaintiff.  (Pl. Dep., p. 223).

123.    No one else made any racial slurs against Plaintiff.  (Pl. Dep., pp. 223-224).

124.    Mr. Boks never made any comments or took any actions that would suggest to Allen that Boks was discriminating against Mr. Artope on the basis of his race.  (Allen Aff., ¶ 3).

**Elimination of Other Positions Held by Caucasians, and Creation of Position Held By African-American**

125.    In addition to terminating Plaintiff's employment, Boks eliminated two executive-level job positions held by Caucasian men.   The elimination of these job positions resulted in terminations of both Caucasian employees, as follows:

(a)    Boks *eliminated* the General Counsel position, as a result of which Julian Praeger, Caucasian, was terminated.  (Boks Dep., pp. 85-86).

---

[13] A copy of the Proposed Agreement, Waiver & General Release is attached to the Lauri Aff. as Exhibit "11."

(b)    Boks *eliminated* the Director of Facilities position, as a result of which James Scott, also Caucasian, was terminated. (Boks Dep., pp. 92-93).

126.    Boks also demoted Jody Jones (Caucasian) from ACC's Public Relations Officer to Shelter Manager of a particular shelter. (Boks Dep., p. 94).

127.    Boks *hired* Gerry Allen, Africa-American for the executive position Director of Human Resources. (Boks Dep., pp. 77, 90-91; Inception Report, p. 5).

128.    Boks also hired Richard Gentles for the new position called Director of Operations. (Gentles Aff.,[14] ¶ 5).

129.    The Director of Operations position combined all of Gentles' former responsibilities as Deputy Executive Director, Mr. Scott's (Caucasian) former responsibilities as Director of Facilities and Plaintiff's (African-American) former responsibilities as Director of Shelter Operations. (Boks Dep., p. 105; Gentles Aff., ¶ 6).

F.    **Post-Termination and Plaintiff's Lawsuit**

130.    Plaintiff alleges that as a result of his termination from ACC, he suffered embarrassment, a short temper, loss in communication and socialization skills, loss of trust in himself and others. (Pl. Dep., pp. 248-252).

131.    Plaintiff has not taken any medications in connection with the above conditions. (Pl. Dep., p. 255).

132.    The Complaint alleges ACC discriminated against Plaintiff on the basis of his race by terminating his employment and paying him less than other Caucasian employees who had different jobs than him.[15] (Complaint, ¶¶ 16, 35-36).

---

[14] A copy of the Affidavit of Richard Gentles, dated February 12, 2007, is attached to the Lauri Aff. as Exhibit "14."

133.    Plaintiff also alleges that Boks, as an individual, aided and abetted ACC's discriminatory conduct.  (Complaint, ¶¶ 32, 39)

134.    The Complaint further alleges a claim for intentional infliction of emotional distress arising out of ACC's termination of Plaintiff's employment.

## CONCLUSION

Based on the above material facts not in dispute, Defendants respectfully request this Court grant Defendants' request to submit a memorandum of law in support of their motion for summary judgment and to grant such other, further relief as this Court seem just and proper.

Respectfully submitted,

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038-4502
(212) 545-4000

Dated: February 12, 2006      By: _____
      New York, New York           Kevin G. Lauri (KL 8714)
                                    Dana J. Scher (DS 7591)

ATTORNEYS FOR DEFENDANTS

---

[16] The employees who were allegedly paid more than Plaintiff were Dina Margolis (an HR employee), Teresa Geary (Plaintiff's supervisor), Mike Pastore (the Director of Field Operations), Jody Jones (a public relations officer) and Evan Arapostathis (a financial and administrative position).  (Boks Aff., ¶¶ 3-7).  All of these positions entailed substantially different responsibilities from Plaintiff's position and from each other's positions.  (Id.)