```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
WESLEY ARTOPE,                          :
                                        :
            Plaintiff,                  :
                                        :
      -against-                         :   05 CV 9283 (KMW)(RLE)
                                        :   OPINION & ORDER
CENTER FOR ANIMAL CARE AND CONTROL,     :
INC., NEW YORK CITY ANIMAL CARE AND     :
CONTROL and ED BOKS,                    :
                                        :
            Defendants.                 :
----------------------------------------x
```

WOOD, U.S.D.J.:

Plaintiff Wesley Artope ("Plaintiff") brings this employment discrimination and state tort law action against his former employer, Animal Care & Control of New York City, Inc. ("ACC"),[1] and his former supervisor, Ed Boks ("Boks") (collectively "Defendants"). Plaintiff alleges that Boks, with the consent and approval of ACC, terminated Plaintiff's employment in January 2004 because of Plaintiff's race, in violation of federal, state, and city employment discrimination laws, and intentionally caused Plaintiff extreme emotional distress, in violation of state tort

---

[1] Although Plaintiff names both "Center for Animal Care and Control, Inc." and "New York City Animal Care and Control" as defendants, Plaintiff makes clear in the Complaint that he believes that both names refer to the same entity. He states that "[u]pon information and belief, defendant Center for Animal Care and Control, Inc. has recently changed its name to New York City Animal Care and Control."

ACC states in its Answer that it is the entity Plaintiff refers to in the caption as both "Center for Animal Care and Control, Inc." and "New York City Animal Care and Control." Plaintiff does not contest ACC's representation of its identity. Accordingly, for the purposes of this motion, the Court treats ACC as the sole entity defendant.

law.

Defendants move for summary judgment on all of Plaintiff's claims.  For the reasons stated below, the Court finds that Defendants <u>have not shown</u> the absence of a genuine issue of material fact as to Plaintiff's employment discrimination claims, but <u>have shown</u> the absence of a genuine issue of material fact as to Plaintiff's intentional infliction of emotional distress claim.  Accordingly, the Court DENIES in part and GRANTS in part Defendants' motion for summary judgment.

I.   <u>Background</u>

A.   <u>Facts</u>

Unless otherwise noted, the following facts are undisputed and are derived from the parties' Local Rule 56.1 statements, affidavits, and other submissions.[2]  The Court construes all evidence in the light most favorable to the Plaintiff and draws

---

[2] Defendants argue that the Court should deem admitted certain facts that Defendants allege in their Local Rule 56.1 Statement, which Plaintiff failed to specifically controvert in correspondingly numbered paragraphs, as required by Local Rule 56.1.  (<u>See</u> Defs.' 56.1 Reply.)  The Court declines to do so.

A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.  <u>See</u> <u>Wight v. BankAmerica Corp.</u>, 219 F.3d 79, 85 (2d Cir. 2000).  Although a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, a court may in its discretion opt to "conduct an assiduous review of the record."  <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotations and citations omitted).

The Court has conducted an assiduous review of the record, and will consider relevant evidence regardless of whether Plaintiff points to that evidence in his Local Rule 56.1 Statement.

all reasonable inferences in the Plaintiff's favor.

    1.  <u>The Parties</u>

      a.  <u>ACC</u>

ACC is a not-for-profit corporation that provides animal care and control services in New York City under a contract with the New York City Department of Health.  (Defs.' 56.1 Stat. ¶¶ 1-2.)  ACC seizes, rescues, and accepts stray, lost, homeless, unwanted, and abandoned animals.  (Defs.' 56.1 Stat. ¶ 3.)  ACC provides these animals with medical treatment and shelter, and attempts to find placements for the animals through adoptions.  When necessary, ACC euthanizes the animals.  (Defs.' 56.1 Stat. ¶ 4.)

ACC maintains three full service shelters, two receiving centers, and one administrative office in New York City.  (Defs.' 56.1 Stat. ¶ 5.)  ACC's executive management team works at ACC's administrative office.  (Defs.' 56.1 Stat. ¶ 8.)

      b.  <u>Ed Boks</u>

Boks served as the Executive Director of ACC from July 2003 to January 2006.  (Defs.' 56.1 Stat. ¶ 9.)

Boks replaced Marilyn Blohm ("Blohm"), who had been ACC's Executive Director from 1997 to 2002.  (Defs.' 56.1 Stat. ¶ 12.)

      c.  <u>Plaintiff</u>

Plaintiff is an African-American male.  (Defs.' 56.1 Stat. ¶ 13.)

Blohm hired Plaintiff to work at ACC in 1997.  (Defs.' 56.1

3

Stat. ¶ 14.)  Between 1997 and 2002, Blohm promoted Plaintiff numerous times, and ultimately promoted Plaintiff to ACC's executive management team.  (Defs.' 56.1 Stat. ¶¶ 20, 26-52.)

Boks terminated Plaintiff's employment with ACC on January 15, 2004.  (Defs.' 56.1 Stat. ¶¶ 15, 17.)

### 2. Plaintiff's Training and Work Experience

Plaintiff has an Associates Degree in Veterinary Technology and a Bachelors Degree in Psychology.  Plaintiff also has licenses and certifications as a veterinary technician, animal handler, and animal rehabilitator, and work experience in animal training, handling, and treatment.  (Defs.' 56.1 Stat. ¶ 23.)

### 3. Plaintiff's Employment at ACC During Blohm's Tenure as Executive Director

In 1997, Blohm hired Plaintiff as a Senior Animal Care Specialist in the Medical Department of ACC's Manhattan shelter. (Defs.' 56.1 Stat. ¶ 22.)  In this position, Plaintiff was responsible for providing medical treatment and administering euthanasia to Manhattan shelter animals.  (Defs.' 56.1 Stat. ¶ 23.)  Plaintiff also trained other veterinary technicians to perform these tasks and supervised their performance.  (Defs.' 56.1 Stat. ¶ 24.)

In 1998, Blohm promoted Plaintiff to Assistant Director of the Manhattan shelter.  (Defs.' 56.1 Stat. ¶ 26.)  In this position, Plaintiff supervised multiple departments at the Manhattan shelter and assumed greater responsibility over animal

4

care, animal adoptions, training and management of employees, and quality control.  (Defs.' 56.1 Stat. ¶¶ 27-28.)

In 1999, Blohm promoted Plaintiff to Training Coordinator for ACC.  (Defs.' 56.1 Stat. ¶ 34.)  In this position, Plaintiff was responsible for training employees in all departments at all ACC shelters.  (Defs.' 56.1 Stat. ¶ 35.)  Plaintiff evaluated conditions at the shelters, identified problems, and trained employees to rectify those problems.  (Defs.' 56.1 Stat. ¶ 37.)

Later in 1999, Blohm promoted Plaintiff to Director of Training for ACC.  (Defs.' 56.1 Stat. ¶ 41.)  In this position, Plaintiff continued to have responsibility for training employees at all ACC shelters.  (Defs.' 56.1 Stat. ¶ 42.)

In 2002, Blohm promoted Plaintiff to Deputy Director of Operations for ACC.  (Defs.' 56.1 Stat. ¶ 44.)  In this position, Plaintiff had further management and public relations responsibilities.  (Defs.' 56.1 Stat. ¶¶ 46-47.)  Plaintiff began reporting directly to Theresa Geary ("Geary"), the Director of Operations.  (Defs.' 56.1 Stat. ¶ 49.)

In 2003, Blohm promoted Plaintiff to Director of Shelter Operations.[3]  (Defs.' 56.1 Stat. ¶ 50.)  In this position,

---

[3] Defendants suggest that Blohm resigned from her position with ACC in 2002.  Yet Defendants also assert that in 2003, Blohm promoted Plaintiff to the position of Director of Shelter Operations.  (See Defs.' 56.1 Stat. ¶¶ 12, 50.)  Plaintiff does not controvert Defendants' representation of these facts.  The Court accepts the facts as proffered, but notes for the record this unexplained inconsistency.

Plaintiff assumed additional responsibility over human resources and client relations.  (Defs.' 56.1 Stat. ¶ 52.)

       4.  <u>Plaintiff's Job Performance at ACC During Blohm's</u>
<u>Tenure as Executive Director</u>

Plaintiff states in his deposition that during Blohm's tenure as Executive Director, managers consistently gave him positive feedback about his performance.  Plaintiff states that Blohm praised his work as Director of Training.  Plaintiff also states that Geary told him that his "problem solving ability and ability to do troubleshooting was great." (Martin 56.1 Aff. Ex. A 118:18-119:22.)

       5.  <u>The Comptroller's Audit Report</u>

Between January 1999 and June 2001, the New York City Office of the Comptroller audited ACC shelter operations, conditions, and adoption efforts.  (Defs.' 56.1 Stat. ¶ 53.)  On June 6, 2002, the Comptroller's Office issued an Audit Report.  (Defs.' 56.1 Stat. ¶ 54.)

The Audit Report stated that ACC failed to provide humane conditions for animals in its shelters and that animals often received poor veterinary care.  (Defs.' 56.1 Stat. ¶ 55.)

Specifically, the Audit Report identified problems at ACC with respect to poor supervision of veterinary staff, failure to terminate employees cited for animal mistreatment, failure to exercise dogs, failure to provide water to animals, failure to consistently clean cages, and failure to appropriately isolate

sick and contagious animals.  In addition, the Audit Report criticized ACC's management for working only to "push animals through the system" rather than to provide humane care for the animals.  (Defs.' 56.1 Stat. ¶ 58.)

6.  <u>Blohm's Resignation and the Subsequent Hiring of Boks</u>

Shortly after publication of the Audit Report, several top management employees resigned from ACC, including Blohm and Geary.  (Defs.' 56.1 Stat. ¶¶ 60-62.)

From fall 2002 until spring 2003, ACC's Board of Directors searched for a new Executive Director.  (Defs.' 56.1 Stat. ¶ 64.) The Board of Directors actively recruited Ed Boks, Executive Director of an animal shelter in Maricopa County, Arizona ("Maricopa County animal shelter"), for the position.  (Defs.' 56.1 Stat. ¶ 66.)

In or about July 2003, ACC's Board of Directors hired Boks as the part-time Executive Director of ACC.  (Defs.' 56.1 Stat. ¶ 68.)  Between July 2003 and December 2003, Boks worked part-time for ACC and part-time for the Maricopa County animal shelter. (Defs.' 56.1 Stat. ¶ 69.)

In January 2004, Boks became full-time Executive Director of ACC.  (Defs.' 56.1 Stat. ¶ 71.)

7.  <u>The Inception Report and Boks' Subsequent Hiring of Gentles</u>

Shortly after he was hired, Boks assembled three volunteer

consultants to evaluate ACC's shelter operations, procedures, protocols, treatment of animals, customer service, and medical functions, and also to identify areas for reorganization. (Defs.' 56.1 Stat. ¶ 72.)

Boks chose Mary Martin ("Martin"), Brenda Sipes ("Sipes"), and Richard Gentles ("Gentles") as his three volunteer consultants. (Defs.' 56.1 Stat. ¶ 73.) Martin was Director of Medical Services for the Maricopa County animal shelter. Sipes had expertise in the field of shelter facilities and management. Gentles was a former Director of Law Enforcement for the New York City Department of Parks and Recreation. (Defs.' 56.1 Stat. ¶¶ 74-76.)

In July 2003, Boks, Martin, Sipes, and Gentles conducted their evaluation. (Defs.' 56.1 Stat. ¶ 77.) Boks and Martin then prepared a written report (the "Inception Report") detailing the problems they had identified at the ACC facilities. (Defs.' 56.1 Stat. ¶ 81.)

Defendants emphasize that the Inception Report found significant problems at ACC with respect to training, disease transmission, the medical program, and operations generally. Defendants assert that these were all areas for which Plaintiff, as Director of Shelter Operations, was responsible. (Defs.' 56.1 Stat. ¶ 82.)

Plaintiff emphasizes that the Inception Report found that ACC's problems were a direct result of underfunding by the New

York City Department Of Health.  Plaintiff points out that the Inception Report stated that most problems at the facility stemmed from the "impossible workload and poor pay," and that "supervisors and managers alike [were] set up to fail."  (Pl.'s 56.1 Opp'n ¶ 85.)

Following the evaluation, Boks hired Gentles as his Deputy Executive Director.  (Defs.' 56.1 Stat. ¶ 86.)

8.  Plaintiff's Employment and Job Performance at ACC During Boks' Tenure as Executive Director

a.  Reduction in Plaintiff's Job Responsibilities

Boks states in his deposition that based on the Inception Report's findings, he became convinced that Plaintiff was to blame for many of the problems at ACC.  (Defs.' 56.1 Stat. ¶¶ 82-84.)  Boks also states that he identified specific problems with Plaintiff's job performance and work conduct.  (Defs.' 56.1 Stat. ¶ 85.)

Plaintiff controverts this evidence, and states that Boks could not reasonably have believed that Plaintiff's individual failings were to blame for the institutional failures at ACC. (Pl.'s 56.1 Opp'n ¶¶ 85, 93.)

In the fall of 2003, Boks restructured Plaintiff's position as the Director of Shelter Operations by dividing it into two separate positions – a Director of Shelter Operations position with reduced responsibilities, and a new Medical Director position.  According to Boks, he made these changes because he

9

hoped that reducing Plaintiff's job responsibilities to reflect Plaintiff's expertise in animal handling would better enable Plaintiff to succeed at his job.  (Defs.' 56.1 Stat. ¶ 98.)

In his restructured Director of Shelter Operations position, Plaintiff remained responsible for shelter operations, i.e. animal handling, animal behavioral assessment, and shelter conditions.  Boks hired Martin as the new Medical Director, and she took over responsibility for training and for the medical program.  (Defs.' 56.1 Stat. ¶¶ 95-97.)

Boks reduced Plaintiff's compensation to reflect the reduction in his responsibilities.  (Defs.' 56.1 Stat. ¶ 99.) Boks also gave Plaintiff a "road map" of thirty-six improvements and/or changes he wanted Plaintiff to make at the shelters. (Defs.' 56.1 Stat. ¶ 100.)

b.  <u>Plaintiff's Termination</u>

Boks states that after restructuring Plaintiff's position, he carefully observed Plaintiff.  Boks claims that based on his observations, he concluded that Plaintiff was continuing to fail at his job.  (Defs.' 56.1 Stat. ¶¶ 102-112.)  Boks states that he informed Plaintiff orally and in writing that Plaintiff's conduct was not in accordance with the road map. (Defs.' 56.1 Stat. ¶ 105; Lauri 56.1 Supp. Aff. Ex. 10.)

Plaintiff controverts this evidence.  Plaintiff states that Boks told him that his performance was great, and that although they discussed ways in which ACC could be improved, Boks never

directly criticized Plaintiff's job performance. (Martin 56.1
Aff. Ex. A 148:18-159:13.)

Boks states that he eventually determined that he should
eliminate the Director of Shelter Operations position and
terminate Plaintiff's employment. (Defs.' 56.1 Stat. ¶ 112.)
Boks claims that he made this decision for two reasons: first, he
had concluded that Plaintiff was unsuccessful at his job, and
second, he believed that it would be more efficient to create one
new position that combined Plaintiff's position, the Director of
Facilities position then held by James Scott ("Scott"), and the
Deputy Executive Director position then held by Gentles. (Defs.'
56.1 Stat. ¶¶ 113-114.) The new position would be called
"Director of Operations." Boks intended to promote Gentles to
the position. (Defs.' 56.1 Stat. ¶ 115.)

On or about January 14, 2004, Boks and Gerry Allen
("Allen"), the Director of Human Resources, met with Plaintiff
and informed him that they were eliminating his position and
terminating his employment, effective immediately. (Defs.' 56.1
Stat. ¶ 120.) Boks then promoted Gentles to the newly-created
Director of Operations position.

Plaintiff controverts Boks' claim that Boks terminated him,
even in part, because of his performance. Plaintiff states that
Boks told him that he was being terminated for budgetary issues,
and that Boks specifically denied that Plaintiff's performance
had motivated the decision. (Pl.'s 56.1 Opp'n ¶ 104; Martin 56.1

11

Aff. Ex. A 207:21-208:17.)

>    9.   Additional Evidence Relevant to an Inference of
>
> Discriminatory Motive
>
>         a.   Gentles' Promotion Over Plaintiff to the
>
> Director of Operations Position

Plaintiff submits evidence that ACC had a policy that new positions had to be openly posted, and that the Director of Operations position was never publically listed in accordance with this policy.  (Martin 56.1 Aff. Ex. A 199:11-207:20.) Furthermore, Plaintiff submits Allen's statement that Plaintiff was never given an opportunity to interview for the Director of Operations position.  (Martin 56.1 Aff. Ex. F 25:18-26:17.)

Plaintiff also submits evidence that he was substantially more qualified than Gentles for the Director of Operations position.  Plaintiff states that Gentles had no experience with animals, and highlights Gentles' admission that his "only experience with veterinary personnel was when he took his pets to the veterinarian."  (Pl.'s 56.1 Opp'n ¶ 110.)  Similarly, Allen states that Plaintiff "knew everything there was to know about animals," and that Gentles was less qualified than Plaintiff for promotion to Director of Operations.  (Martin 56.1 Aff. Ex. F 21:16-23:20.)

Plaintiff further states, and submits statements from others, that before beginning his volunteer position with ACC, Gentles had been terminated from his position with the New York

City Department of Parks and Recreation following his arrest and conviction for a job-related crime.  Specifically, Plaintiff submits evidence that Gentles was arrested for a felony, and pled guilty to the Class A misdemeanor of offering a false instrument for filing.  (Pl.'s 56.1 Opp'n ¶ 110.)  Allen knows of no employee with a criminal record, other than Gentles, who was hired for an executive management position at ACC.  (Martin 56.1 Aff. Ex. F 38:10-38:16.)

Plaintiff also submits evidence that Gentles had a close relationship with ACC Board Member, Sara Hobel ("Hobel"), and that she recommended Gentles to Boks.  (Pl.'s 56.1 Opp'n ¶ 110.)

b.  <u>Plaintiff's Treatment in Comparison to Similarly Situated Employees During the Reorganization</u>

Boks states that during the reorganization, in addition to terminating Plaintiff's position, he also eliminated two executive-level positions held by white employees.  Specifically, Boks states that he eliminated the General Counsel and Director of Facilities positions, as a result of which, two white employees, Julian Praeger ("Praeger") and Scott, respectively, were terminated.  (Defs.' 56.1 Stat. ¶¶ 125-129.)

Boks also states that he demoted a white employee, Judy Jones ("Jones"), from ACC's Public Relations Office to Shelter Manager of one ACC shelter.  (Defs.' 56.1 Stat. ¶ 126.)  Boks further states that he hired Allen, who is African-American, for the executive position of Director of Human Resources.  (Defs.'

13

56.1 Stat. ¶ 127.)

Plaintiff controverts the accuracy and completeness of this evidence.  Plaintiff submits Allen's statement that, at most, Defendants terminated one white employee, Scott, during the reorganization,[4] and that Allen specifically cautioned Boks not to "downsize" minorities and replace them with newly-hired white employees.  (Martin 56.1 Aff. Ex. F 17:14-18:8, 34:18-23.)

Plaintiff highlights Jones' demotion as reflecting the fact that Defendants offered white employees, but not him, the choice of transferring to another job rather than being terminated. (Martin 56.1 Aff. Ex. A 210:2-212:6.)

c.  <u>Plaintiff's Work Conditions Generally</u>

Plaintiff submits evidence that prior to the reorganization, he was the only minority in executive management or on the Board of Directors at ACC.  (Martin 56.1 Aff. Ex. F 12:2-13:6.)

Plaintiff states that he was paid less than his white colleagues with similar skills, but he does not provide evidence, other than his own statements, that he and those colleagues had similar qualifications or similar responsibilities.  (Martin 56.1 Aff. Ex. A 174:8-188:22.)  Defendants controvert Plaintiff's

---

[4] Allen makes potentially inconsistent statements about whether Defendants also terminated white employees during the reorganization.  Allen first states that <u>only</u> minorities were "downsized"; Allen later states that Defendants terminated Scott, who is white, during the reorganization.  (Martin 56.1 Aff. Ex. F 17:14-18:8, 34:18-23.)

Neither Plaintiff nor Defendants proffer any evidence about the circumstances of Scott's alleged termination.

claims about his pay.  (Supp. Mem. 16.)

Plaintiff further states that he was provided with less support staff assistance than the other directors.  (Martin 56.1 Aff. Ex. A 216:12-20.)

Finally, Plaintiff states that small notes with the term "go-fer" were left on his desk three or four times during his employment at ACC.  (Martin 56.1 Aff. Ex. A 213:16-216:2.)

B.  <u>Procedural History</u>

Plaintiff initiated this employment discrimination and state tort law action in November 2005, alleging that by terminating him because of his race, (1) Defendant ACC violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>; and (2) Defendants ACC and Boks violated (a) New York State Executive Law § 296 <u>et seq.</u>, (b) New York City Administrative Code, Title 8, § 8-107 <u>et seq.</u>, and (c) New York state tort law prohibiting the intentional infliction of emotional distress.  Defendants did not file any motions to dismiss, and the case proceeded through discovery.

In October 2007, Defendants asserted their intention to file a motion for summary judgment.  The Court ordered parties to first submit Local Rule 56.1 Statements, and the parties did so. After reviewing the parties' Local Rule 56.1 Statements, the Court permitted Defendants to file a motion for summary judgment. This motion followed.

II.  <u>Analysis</u>

A. <u>Summary Judgment Standard</u>

Summary judgment is appropriate only if the pleadings, affidavits, and disclosures that form the record establish that there is no "genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party. <u>NetJets Aviation, Inc. v. LHC Commc'ns, LLC</u>, 537 F.3d 168, 178-79 (2d Cir. 2008). In deciding a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. <u>In re "Agent Orange" Prod. Liab. Litig.</u>, 517 F.3d 76, 87 (2d Cir. 2008). The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." <u>W. World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotations omitted).

In deciding a motion for summary judgment, the role of the Court is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). Because the Court's role is limited in this respect, the Court may not make

16

factual findings, determine credibility of witnesses, or weigh evidence.  See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005); Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

   B.   Employment Discrimination Claims

      1.   Legal Standard

   On a motion for summary judgment, claims of discrimination under Title VII, the New York State Human Rights Law, and the New York City Administrative Code are analyzed under the three-step burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295 (2004) (applying the McDonnell Douglas framework to claims brought under the New York State Human Rights Law and the New York City Administrative Code).

   Pursuant to this three-step analysis, a plaintiff must first establish a prima facie case of discrimination, by "introduc[ing] evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor." Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008).  A plaintiff must show: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held [or to which she applied]; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory

17

intent." Id.; see also McDonnell Douglas, 411 U.S. at 802.  The
burden in establishing a prima facie case is "de minimis."
Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005).

Once a plaintiff establishes a prima facie case, "a
presumption of discrimination arises and the burden shifts to the
defendant to proffer some legitimate, nondiscriminatory reason
for the adverse decision or action." Dawson v. Bumble & Bumble,
398 F.3d 211, 216 (2d Cir. 2005) (quoting Farias v. Instructional
Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001)).  "This burden is
only of production [of evidence], not of persuasion." Constance
v. Pepsi Bottling Co., No. 03 Civ. 5009, 2007 WL 2460688, at *14
(E.D.N.Y. Aug. 24, 2007).  "If the defendant proffers such a
reason, the presumption of discrimination created by the prima
facie case drops out of the analysis." Dawson, 398 F.3d at 216.
The plaintiff must then show, by a preponderance of the evidence,
that the reason the defendant has offered is pretextual, and that
the adverse action was in fact motivated by discrimination. Id.;
see also McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215
(2d Cir. 2006).  "[T]he ultimate burden rests with the plaintiff
to offer evidence sufficient to support a reasonable inference
that prohibited . . . discrimination occurred." Woodman, 411
F.3d at 76 (internal quotation marks and citations omitted).

In determining the appropriateness of summary judgment, the
court must determine whether the plaintiff has presented facts
pursuant to the McDonnell Douglas framework such that a

18

reasonable jury could infer that the employer based its
employment decision on an impermissible factor.  See Jute v.
Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).
"Summary judgment should be granted sparingly when intent is at
issue." Ramos v. Marriott Int'l, Inc., 134 F. Supp. 2d 328, 345
(S.D.N.Y. 2001).  Moreover, "the court should not consider the
record solely in piecemeal fashion, . . . for a jury, in
assessing whether there was impermissible discrimination and
whether the defendant's proffered explanation is a pretext for
such discrimination, would be entitled to view the evidence as a
whole." Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir.
2000).

     2.  Application

     Defendants argue that the Court should grant summary
judgment against Plaintiff on his employment discrimination
claims because (1) Plaintiff fails to establish the fourth
element of a prima facie case – that his termination occurred
under circumstances giving rise to an inference of
discrimination; and (2) Plaintiff fails to show that Defendants'
alleged, legitimate, non-discriminatory reasons for terminating
him are pretextual; and that the real reason Defendants
terminated him was because of his race.  (Supp. Mem. 11-12, 14-
17.)

     For the reasons stated below, the Court denies Defendants'
motion for summary judgment on Plaintiff's employment

19

discrimination claims.  The Court concludes that (1) a reasonable jury could find that Plaintiff was terminated under circumstances giving rise to an inference of discrimination; (2) that Defendants' alleged, legitimate, non-discriminatory reasons for terminating Plaintiff are pretextual; and (3) that, more likely than not, Defendants terminated Plaintiff because of his race.

a. <u>Prima Facie Case</u>

Plaintiff argues that because he was replaced by someone outside his protected class, his termination occurred under circumstances giving rise to an inference of discrimination.[5] (Opp'n Mem. 14-15.)  In response, Defendants' two strongest counter arguments are (1) Plaintiff was not, in fact, replaced; rather, his position was eliminated pursuant to the

---

[5] Plaintiff also claims that his position remained open after he was terminated.  According to Plaintiff, several months after Boks allegedly eliminated his position as Director of Shelter Operations, Defendants issued a job announcement soliciting applications for the position, or at the very least, revealing that the position continued to exist.  (Opp'n Mem. 2, 14-15.)

In response, Defendants introduce evidence that the job announcement to which Plaintiff refers advertised a "Supervisor for Shelter Operations" position entirely different than the Director of Shelter Operations position Plaintiff held.  (Reply Mem. 2-4; Clemmons Reply Aff.; Gentles Reply Aff.)  Plaintiff does not controvert this evidence.  Accordingly, based on the evidence submitted to the Court for the purposes of summary judgment, the Court concludes that no reasonable jury could find that Defendants continued to accept applications for Plaintiff's position, or that Plaintiff's position remained open.

The Court's conclusion, however, does not mean that evidence of the new job opening is irrelevant.  A reasonable jury could consider, for instance, why Defendants did not demote Plaintiff to this other position, rather than terminating his employment entirely.

reorganization; and (2) Defendants' termination of Plaintiff
should not create an inference of discrimination because
Defendants also terminated white employees during the
reorganization.  (Supp. Mem. 11-12.)  Both of these arguments are
ultimately unavailing.  Construing the facts in the light most
favorable to the Plaintiff, the Court finds that a reasonable
jury could conclude that Plaintiff's termination occurred under
circumstances giving rise to an inference of discrimination.

First, Defendants argue that Plaintiff's termination does
not create an inference of discrimination because Defendants
eliminated Plaintiff's position, and therefore, Plaintiff could
not have been – and was not – replaced.[6]  (Supp. Mem. 12.)
Defendants' argument on this point relies on an overly
formalistic analysis of the events surrounding Plaintiff's
termination.  The Court concludes that a reasonable jury could
find that Plaintiff was replaced, and accordingly, that his
termination occurred under circumstances giving rise to an
inference of discrimination.

In cases involving a reduction in force, the Second Circuit
has made clear that the critical question is whether the

---

[6] To the extent that Defendants also suggest that the
elimination of Plaintiff's position does not give rise to an
inference of discrimination because Defendants' intent was to
eliminate the position, and not Plaintiff, that argument is
directly contradicted by Boks' statements that Plaintiff's
allegedly poor job performance partly motivated his decision to
eliminate Plaintiff's position.

circumstances – in their entirety – support an inference of discrimination.  See Burger v. New York Inst. of Tech., 94 F.3d 830, 834 (2d Cir. 1996).  Accordingly, even if an employer eliminates a plaintiff's position, the circumstances may nonetheless give rise to an inference of discrimination if the employer then reassigns the plaintiff's duties to another employee.  See, e.g., id. (noting that because a substantial portion of the plaintiff's duties were transferred to an employee outside her protected class, a trier of fact could find that the pertinent decision was "which person to lay off and not simply which job to eliminate"); see also Chow v. Stride Rite Corp., No. 05 Civ 02417, 2009 WL 196030, at *6-8 (S.D.N.Y. Jan. 27, 2009) (finding that the plaintiff satisfied the fourth prong of a prima facie case, for the purposes of summary judgment, by introducing evidence permitting a reasonable jury to find that a newly-created position was a replacement for two eliminated positions).

Here, even though Defendants eliminated Plaintiff's position, Director of Shelter Operations, Defendants did not eliminate Plaintiff's duties.  The parties agree that Gentles, in the newly-created position of Director of Operations, was responsible for duties formerly performed by Plaintiff.  (Defs.' 56.1 Stat. ¶ 129.)  Plaintiff was, in effect, replaced, and his replacement, Gentles, was an employee outside Plaintiff's protected class.  (Defs.' 56.1 Stat. ¶ 19.)  Replacement by someone outside the plaintiff's protected category is a

circumstance that gives rise to an inference of discrimination. See, e.g., D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 195 (2d Cir. 2007) (replacement of a plaintiff by someone outside the plaintiff's protected class creates inference of discrimination).

Second, Defendants argue that the termination of white employees during the reorganization negates any inference of discrimination created by Boks' decision to terminate Plaintiff. (Supp. Mem. 12.)  The Court again disagrees.  Defendants fail to show the absence of a genuine issue of fact as to whether Plaintiff was treated differently than white employees during the reorganization, and even if Defendants had so shown, the Court is not convinced, under the circumstances, that such a fact would be material.

The record contains conflicting evidence about who Boks terminated during the reorganization.  Boks states that, in addition to Plaintiff, he terminated two white employees, Praeger and Scott, and that he demoted one white employee, Jones. (Defs.' 56.1 Stat. ¶¶ 125-26.)  Plaintiff submits Allen's statement that, at most, one white employee, Scott, was terminated during the reorganization.  (Martin 56.1 Aff. Ex. F 17:14-18:8, 34:18-23.)

Furthermore, there is evidence in the record suggesting that even those white employees allegedly affected by the reorganization were either not similarly situated to Plaintiff, or were treated better than Plaintiff.  Boks' statements, for

instance, suggest that he eliminated Praeger's position as General Counsel because Boks no longer intended for legal work to be performed in-house at ACC.  (Lauri 56.1 Reply Aff. Ex. 3 85:23-86:7.)  Accordingly, Praeger's termination, even if established, would differ substantially from Plaintiff's.  Similarly, Plaintiff states that when Defendants eliminated Jones' position, Defendants offered to demote her to a lower position in lieu of being terminated, an offer which she accepted.  According to Plaintiff, Defendants did not offer him the same choice.  (Martin 56.1 Aff. Ex. A 209:8-212:3.)

Construing all facts in the light most favorable to the Plaintiff, the Court cannot determine whether the pattern of positions eliminated and employees terminated during the reorganization weakens, or, in fact, potentially strengthens Plaintiff's <u>prima facie</u> case.  The Court further notes, however, that even if it were to fully credit Defendants' version of the facts, Plaintiff would likely still have made a <u>prima facie</u> showing.  The record is clear that ACC did not engage in a massive layoff.  Boks' own statements show that he made individualized determinations regarding which employees he should retain and which he should terminate.  (<u>See</u> Lauri 56.1 Supp. Aff. Ex. 3, Lauri 56.1 Reply Aff. Ex. 3.)  Therefore, a reasonable jury might still find that Boks terminated Plaintiff under circumstances giving rise to an inference of discrimination, even if Boks also terminated one or two white employees at the same

24

time.

The showing necessary to establish a <u>prima facie</u> case of
discrimination is <u>de minimis</u>.  Defendants terminated Plaintiff's
employment, and reassigned many of Plaintiff's job
responsibilities to someone outside his protected category.  The
Court finds that Plaintiff has established a <u>prima facie</u> case of
employment discrimination pursuant to the <u>McDonnell Douglas</u>
framework.

> b.  <u>Defendants' Legitimate, Non-discriminatory</u>
<u>Reasons</u>

Defendants proffer two legitimate, non-discriminatory
reasons for terminating Plaintiff.[7]  First, Defendants submit
evidence that "Plaintiff repeatedly failed in his job
responsibilities"; that Boks concluded that Plaintiff's poor job
performance contributed to ACC's organizational problems, as
detailed in the Audit and Inception Reports; and that Boks
consequently decided to terminate Plaintiff's employment.  (Supp.
Mem. 13; Defs.' 56.1 Stat. ¶ 113.)

Second, Defendants submit evidence that Boks concluded that
a reorganization would help ACC run more effectively, and that
"it would be more efficient to create one new position that
combined Plaintiff's job as Director of Shelter Operations with

---

[7] Plaintiff does not contest that Defendants have met their
burden to produce legitimate, non-discriminatory reasons for
their action.

two other positions he would eliminate: the Director of
Facilities position and the Deputy Executive Director."  (Supp.
Mem. 14; Defs.' 56.1 Stat. ¶ 114.)

As already discussed, a defendant's burden at this stage in
the McDonnell Douglas framework is only a burden of production,
not a burden of persuasion.  The Court finds that Defendants have
satisfied their burden to proffer legitimate, non-discriminatory
reasons for terminating Plaintiff.[8]

c.  Discriminatory Motive

Ultimately, to succeed on an employment discrimination
claim, the plaintiff must show "that the proffered reason was not
the true reason for the employment decision . . . and that race
was."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 508 (1993)
(internal quotations and citations omitted) (emphasis added).
Defendants argue that Plaintiff fails to provide evidence that
would permit a reasonable jury to find in Plaintiff's favor
because (1) Plaintiff does not make a substantial showing that
Defendants' alleged, legitimate reasons are pretextual;[9] and (2)

_____

    [8] Because the burden at this stage of the McDonnell Douglas
framework is minimal, the Court accepts both of these reasons as
proffered.  However, as discussed below in the Court's pretext
analysis, the Court finds that Defendants' second alleged,
legitimate, nondiscriminatory reason, namely that the
reorganization motivated Plaintiff's termination, lacks
explanatory value, see infra section II.B.2.c.i.b.

    [9] Defendants argue that Plaintiff must make a substantial
showing of pretext to survive summary judgment.  In support of
this articulation of the standard, Defendants cite a single
Southern District of New York decision, Obabueki v. Int'l Bus.

Plaintiff does not establish that his termination was because of
his race.  (Supp. Mem. 14-17.)  The Court disagrees.

i.  Pretext

Based on the evidence Plaintiff submits for the purpose of
summary judgment, the Court concludes that a reasonable jury
could find that Defendants' alleged, legitimate, non-
discriminatory reasons for his termination are pretextual.

(a).  Job Performance

Plaintiff submits evidence that a reasonable jury could
disbelieve Defendants' representations of Plaintiff's allegedly
poor job performance.

First, Plaintiff notes the lack of any proof, other than
Boks' statements, of his allegedly poor performance.  Plaintiff
points out that until Boks became his supervisor, Plaintiff was
promoted regularly to positions of increasing responsibility, a
record that does not suggest shoddy performance.  (See Pl.'s 56.1
Stat. ¶ 2.)  Plaintiff also states that he was never given a
written negative performance evaluation during his entire tenure

---

Machs., 145 F. Supp. 2d 371, 386 (S.D.N.Y. 2001), which in turn,
relies on a single sentence from the Supreme Court's decision in
Reeves v. Sanderson Plumbing Prod., 530 U.S. 133, 144 (2000)
(stating that petitioner had made "a substantial showing that
respondent's explanation was false.").
    Defendants misstate the applicable standard.  The correct
inquiry on summary judgment is whether Plaintiff has presented
sufficient evidence such that a reasonable jury could conclude
that Defendants' alleged, legitimate, non-discriminatory reasons
are pretextual.

at ACC.  (Opp'n Mem. 10-11.)  Furthermore, Plaintiff states that Defendants did not raise the issue of negative job performance until after Plaintiff initiated this lawsuit.  Plaintiff claims that, at the time of his termination, Boks told him that the sole reason for his termination was budgetary.  (Pl.'s 56.1 Stat. ¶ 104; Martin 56.1 Aff. Ex. A 207:21-208:17.)

Second, Plaintiff presents evidence that a reasonable jury could disbelieve Defendants' attribution of ACC's organizational problems to his job performance.  Specifically, Plaintiff presents evidence that ACC was chronically underfunded, and that Boks' own Inception Report concluded that underfunding was the primary cause of ACC's problems.  (Pl.'s 56.1 Stat. ¶¶ 85, 93.)

Finally, Plaintiff submits evidence that he was more qualified than Gentles for the position of Director of Operations.  Gentles had no experience in the animal care and control field.  Furthermore, Gentles had recently been convicted of a work-related crime and terminated from a prior job.  (See Pl.'s 56.1 Stat. ¶¶ 110, 116.)

Based on all this evidence, the Court concludes that a reasonable jury could find that Defendants' first alleged, legitimate, non-discriminatory reason, namely that Boks terminated Plaintiff because of Plaintiff's poor job performance, is pretext.

### (b).  Reorganization

Plaintiff does not offer evidence attempting to discredit

28

Defendants' claim that Plaintiff's termination was also motivated by the reorganization.  The Court finds, however, that Plaintiff need not have done so.  The Court concludes that the reorganization, alone, is an insufficient explanation for Plaintiff's termination.

Contrary to Defendants' arguments, the reorganization alone does not explain Plaintiff's termination.  Even if the Court were to fully credit Boks' claim that he believed combining three positions into one would make ACC operate more efficiently, his belief would explain only why he eliminated Plaintiff's position – not why he terminated Plaintiff – and Plaintiff's termination is the adverse employment action at issue in this case. Plaintiff's termination became fait accompli not because the Director of Shelter Operations position was eliminated, but because Boks promoted Gentles, rather than Plaintiff, to the newly-created Director of Operations position.  Based on the record, a reasonable jury could conclude that the fundamental question at issue in this case is why Defendants promoted Gentles over Plaintiff.  The reorganization does not provide an answer to this question.

For these reasons, the Court concludes that Defendants assert only one legitimate, non-discriminatory reason with any explanatory value, namely that Plaintiff's job performance was poor, and the Court has already found that a reasonable jury could find that reason to be pretextual.

29

ii. <u>Ultimate Burden</u>

Finally, Defendants argue that Plaintiff fails to meet his ultimate burden of submitting evidence such that a reasonable jury could find that he was discriminated against because of his race.[10]  The Court, once again, disagrees.  Viewing the available evidence as a whole, the Court finds that a reasonable jury could conclude that Defendants terminated Plaintiff because of his race.

First, Plaintiff submits the evidence that constitutes his <u>prima facie</u> case, namely that Boks terminated a qualified African-American man and replaced him with a white man.  Second, Plaintiff submits evidence that Defendants' alleged, legitimate,

---

[10] Here, Defendants verge on arguing that Plaintiff's claim fails because his presentation relies on indirect, rather than direct, evidence.  (Supp. Mem. 16.)  To the extent that they make such an argument, Defendants misapprehend the applicable legal standard.

The Supreme Court has repeatedly made clear that indirect evidence, consisting solely of a plaintiff's <u>prima facie</u> case and a showing of pretext, <u>can</u> be sufficient to permit a finding that more likely than not, an adverse action was taken because of discrimination.  <u>See</u> <u>Reeves</u>, 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."); <u>see also</u> <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with <u>some</u> reason, based his decision on an impermissible consideration such as race.").

non-discriminatory reasons for terminating Plaintiff are

pretextual, and/or inherently lacking in any explanatory value.

Specifically, Plaintiff introduces evidence that his job

performance was strong, and that Defendants could not reasonably

have attributed ACC's failings to him.[11]  Third, the Court

considers the evidence of Plaintiff's employment history at ACC

and the chronology of events leading up to his termination.  For

at least seven years, during Blohm's tenure as Executive

_____

[11] Plaintiff weakens his own case, however, by submitting
evidence that Defendants' alleged, legitimate reasons were
pretext, not only for a discriminatory motive, but also for a
non-discriminatory motive, namely that Hobel, allegedly a good
friend of Gentles, had pushed Boks to find a place for Gentles
within the organization.  (Pl.'s 56.1 Stat. ¶ 110.)  The
termination of a qualified African-American employee in order to
hire the friend of a Board Member, although perhaps
unmeritocratic, is not in itself actionable under Title VII or
its state and city counterparts.
     Nonetheless, the Court finds that this evidence is
insufficiently harmful to Plaintiff's case to make summary
judgment for Defendants appropriate.  See Parker v. Columbia
Pictures Indus., 204 F.3d 326, 336 (2d Cir. 2000) (reversing and
remanding district court's grant of summary judgment because
district court based its dismissal on plaintiff's concession that
another reason besides discrimination might also have motivated
his discharge; under a "mixed motive" analysis, a defendant is
liable as long as he is motivated, in part, by an illegitimate
reason).
     In the instant case, Plaintiff submits evidence that
Defendants' alleged, legitimate reasons were pretext for both
discrimination and nepotism.  Plaintiff also analytically links
the two by suggesting that, because of race discrimination,
Defendants chose to terminate him, rather than a white employee,
in order to hire the friend of a Board Member.  (See Pl.'s 56.1
Stat. ¶ 110.)
     At trial, the jury will have to decide whether Defendants'
alleged, legitimate reason is pretextual; and if so, whether the
reason is pretext for discrimination, pretext for nepotism, or
both.  The first and third are legally actionable under Title
VII; the second is not.

Director, Plaintiff received positive feedback on his work performance, and was regularly promoted to positions of increasing responsibility.  Within six months of Boks taking over the Executive Director position, however, Boks demoted Plaintiff, lowered his pay, and ultimately eliminated his position and terminated his employment.  Fourth, Plaintiff submits evidence that he was more qualified than his replacement, Gentles, both because Plaintiff had more experience in the animal care and control field, and because Gentles had recently been convicted of work-related fraud, and consequently was terminated from his previous job.  Finally, Plaintiff submits evidence, in the form of statements from ACC's Human Resources Manager, that Plaintiff was, for awhile at least, the only minority in executive management at ACC or on ACC's Board of Directors, and that the reorganization disparately impacted employees of color.

Construing all facts in the light most favorable to Plaintiff, drawing all reasonable inferences in his favor, and neither weighing the evidence nor assessing credibility, the Court finds that Defendants have failed to show the absence of a genuine issue of material fact as to whether Defendants terminated Plaintiff because of his race.

### 3.  Conclusion

For the reasons stated above, the Court DENIES Defendants' motion for summary judgment on Plaintiff's employment discrimination claims.

C.  Intentional Infliction of Emotional Distress Claim

Defendants also argue that Plaintiff's intentional infliction of emotional distress claim fails because Plaintiff presents insufficient evidence that Defendants' conduct was either extreme or outrageous, or that Plaintiff suffered severe emotional distress.  (Supp. Mem. 18-20.)

Plaintiff agrees that he cannot sustain a claim of intentional infliction of emotional distress on the record before the Court.  (Opp'n Mem. 17.)

Accordingly, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's intentional infliction of emotional distress claim.

III.  Conclusion

For the reasons stated above, the Court DENIES in part and GRANTS in part Defendants' motion for summary judgment (D.E. 48).

No later than April 10, 2009, the parties shall submit a joint pre-trial order.  The pre-trial order must conform to the Court's Individual Practices, a copy of which may be obtained at http://www1.nysd.uscourts.gov/cases/show.php?db=judge_info&id=427. The pre-trial order also must contain a one-page joint statement of the nature of the case to be read to prospective jurors by the Court at voir dire.

Any motions in limine shall be submitted with the pre-trial order, no later than April 10, 2009.

No later than April 13, 2009, the parties shall submit

33

responses to any motions in limine.  No later than April 15, 2009, the parties shall submit any replies to the responses.

The case is set for pre-trial on April 15, 2009, at 9:00 a.m.

This case is deemed ready trial as of April 13, 2009.  At any time after the Ready Trial Date, the Court may call the parties to trial upon forty-eight hours notice.  No adjournment of that trial date will be permitted, unless counsel has faxed to chambers an <u>affidavit</u> stating that he or she is engaged in trial in another court.  This affidavit shall include: (1) the caption of the other case, including its index number; (2) the expected length of the trial; (3) the court in which the other case is to be tried; and (4) the name and telephone number of the judge presiding over the case.  Counsel shall notify the Court and all other counsel in writing, at the earliest possible time, of any particular scheduling problems involving out-of-town witnesses or other exigencies.

SO ORDERED.

Dated:     New York, New York
           March 27, 2009

_Kimba M. Wood_
Kimba M. Wood
United States District Judge

34